# District Court of the United States
# District of Columbia Washington, D.C.

Case: 1:16-cv-01513
Assigned To : Unassigned
Assign. Date : 7/27/2016
Description: Pro Se Gen. Civil (F Deck)

William Guy, 43 Fales Ave. Barrington,
Rhode Island 02806  Phone (401) 289-0806
a.k.a. "Sagamore Winds Of Thunder",
American Indian, duly elected Sagamore
of the Pokanoket Tribal Nation
       Plaintiff,

    V.

The STATE OF RHODE ISLAND, 82 Smith St.
#115 Providence, RI 02903, TOWN OF BRISTOL,
10 Court St. Bristol, RI 02809 TOWN OF
BARRINGTON, 283 County Rd. Barrington, RI
02806,and TOWN OF WARREN,514 Main St.
Warren, RI 02885, BRISTOL COUNTY, Formerly
known as SOWAMS in the State of Rhode Island,
 Individually, and as representatives of a DEFENDANT
class composed of all persons and entities et al.
       DEFENDANTs.

# VERIFIED COMPLAINT

# I. JURISDICTION

## PROTECTIONS AND RELIEF DEMANDED UNDER ARTICLE III JURISDICTION

The jurisdiction of the Court is invoked pursuant to <u>Jus Cogens</u> for breach of a peremptory norm of international law, See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264–68 (1977). Cf. RECHTSCHAFFEN & GAUNA, supra note 75, at 49–53 (discussing racism as a cause of environmental justice problems) and where Petitioner has protected status of the victim and is a member of a discrete and insular minority, United States v. Carolene Products Co., 304 U.S. 144, 153 n.4 (1938). See also Edward J. Erler, Equal Protection and

RECEIVED

JUN 3 0 2016

District & Bankruptcy

*1*

42    Personal Rights: The Regime of the "Discrete and Insular Minority," 16 GA. L. REV. 407
43    (1982), See, e.g., Soc. and Econ. Rights Action Ctr. for Econ. and Soc. Rights v. Nigeria,
44    Communication No. 155/96, African Commission on Human and Peoples' Rights (2001), at
45    paras. 44–48 (explaining that Nigeria has an obligation to refrain from interfering with rights,
46    to ensure that others respect rights, and to fulfill its obligations under human rights regimes to
47    protect rights and freedoms).

48
49    Plaintiff claims for relief under Jus Cogens and the Alien Tort Statute for violations of
50    international norms  causing the Destruction of Plaintiff's environment and the forced
51    assimilation and integration of the Plaintiff and Pokanoket people into colonial society, such
52    violations have had lasting negative influence on sustainable food, housing, land rights and
53    zoning patterns, and the colonial reshaping of race, power, and wealth dynamics, have all
54    caused and perpetuated environmental racism and to this extent, the DEFENDANTs
55    propagation of these policies have tolerated such discriminatory results, that DEFENDANT
56    state of Rhode Island has and continues to engages in patterns of systematic racism in violation
57    of Jus Cogens and the Alien Tort Statute.

58
59    Relief may be awarded pursuant to Law of nations. This Court has venue of this action because
60    the subject matter claims of (A) environmental deprivations of human rights, (B) particularly
61    vulnerable racial communities and (C) procedural environmental rights violations, and (D)
62    plaintiff's foreign aborigine status claims falls within the venue of the District Court of the
63    United States, Washington, D.C. under Jus Cogens and the Alien Tort Statute. G.A. Res
64    49/146, UN. Doc. No. A/RES/49/146 (Feb. 7, 1995) (reiterating that racism is one of the
65    world's worst problems); U.N. Econ. & Soc. Council, Comm. on Econ., Soc., and Cultural
66    Rights, *General Comment No. 20*, ¶ 2, U.N. Doc. E/C.12/GC/20 (July 2, 2009) ("Non-
67    discrimination and equality are fundamental components of international human rights law . . .
68    ."); Declaration on Race and Racial Prejudice, U.N. Educational, Scientific and Cultural
69    Organization (UNESCO), 20th Sess., gen. conf., U.N. Doc E/CN.4/Sub.2/1982/2/Add.1, annex
70    V (Oct. 17, 1982) [hereinafter UNESCO Declaration on Race]; Int'l Law Comm'n,
71    *Fragmentation of International Law: Difficulties Arising from the Diversification and*
72    *Expansion of International Law*, *33, U.N. Doc. A/CN.4/L.702 (July 18, 2006); Juridical
73    Condition and Rights of the Undocumented Migrants, Advisory Opinion OC-18/03, Inter-Am.
74    Ct. H.R. (ser. A) No. 18, ¶ 1 (Sep. 27, 2003) (Pesantes, J., concurring) ("[E]quality and

75  nondiscrimination are rights that form a platform on which others are erected"). Plaintiffs'
76  claims for relief also arise under the Supremacy Clause of the United States Constitution.

77
78  **PROTECTIONS AND RELIEF DEMANDED UNDER ARTICLE III JURISDICTION**
79

80  Plaintiff is a NON-RESIDENT INHABITANT of and FOREIGN NATIONAL to the State
81  of Rhode Island and Massachusetts, and Article III jurisdiction is essential to bringing proper
82  remedy to Plaintiff's Article III, Alien Tort Statute (ATS), Jus Cogens claim. The "UNITED
83  STATES DISTRICT COURT" lacks jurisdiction to issue "ORDER" in this matter.

84

85  Plaintiff received communication from the court, where the court has returned a claim filed
86  in January 2016. The return of the filing and rejecting the filing, appears to be an effort to derail
87  Plaintiff's claim. The actions of the Court has delayed this matter, and other efforts have gone so far
88  as to remove the previous Judge, Chief Justice Richard Warren Roberts, after Judge Roberts clearly
89  accepted Plaintiff's filings as proper.

90

91  Due to the perceived lack of understanding of Plaintiff's initial request for Law of Nations
92  jurisdiction, and the current actions of the Court in not fulfilling the obligation to uphold justice,
93  Plaintiff has found it necessary to explain to the Court, the foundation on which the District Court
94  of the United States, District of Columbia [Washington, D.C.] sits.

95

96  The Court is invited to go to UNITED STATES CODE and read first §91 and then examine
97  every other district court to find one ordained and established under Article III in all the continental
98  states of the United states. In "CHAPTER 5—UNITED STATES CODE, DISTRICT COURTS";
99  ending with the paragraph below: "HISTORICAL AND REVISION NOTES." If you were not
100  aware of pages 42 and 43 of Title 28 U.S.C., or if you have trouble reading or printing out these
101  pages, you can also access Title 28 U.S.C. by going to http://uscode.house.gov/title_28.htm.

102

103  Plaintiff asserts that the Court has gone too far and should be RECUSED from this case, and
104  all matters be "ORDERED" and served upon DEFENDANTS. This matter should be accepted with
105  the original filing date of January 7, 2016 and service of "Process" to DEFENDANTs without
106  delay. The District Court For The United States of America, District of Columbia [Washington,
107  D.C.] is the proper venue and Plaintiff has examined the statute law that created every United States

108    district court and has found only one instance where Congress appeared to ordain and establish an
109    Article III United States district court in any state.

111          In 1959, the Congress created an Article III United States district court for Hawaii, but made
112    no provision for Article III judges by specifically precluding the President from appointing them.
113    The Code specifically provides for territorial judges for the Hawaiian Article III court. Title 28
114    U.S.C.—Judiciary and Judicial Procedure has been enacted into positive law so the Code shows the
115    same kinds of courts as are found in the statutes. Chapter 5 of Title 28 U.S.C.—District Courts
116    consists of Sections 81 through 144. The names of all 50 states of the Union will be found from
117    Sections 81 to 131 and in addition in Section 88 will be found the District of Columbia and in
118    Section 119 Puerto Rico.

120          The nature of the astounding revelations in this matter obviously requires this unique format
121    where facts are presented in support of the proposition that a non ARTICLE III court existing in
122    any state of the Union cannot exercise Article III judicial power. This kind of presentation invites
123    facts that proves this position.

125          Plaintiff provides as an example of a fact: Title 28 U.S.C. is territorial law; this fact will be
126    supported by material found in the notes to §91. Those in federal litigation, or who are
127    contemplating that exercise, should be aware that legal justice is available only from courts that
128    have judicial power. Any litigant in any United States district court in any state of the Union is
129    warned that these courts have no Article III, Section 2 judicial power, whatsoever.

131          The United States district courts of the several states are not judicial courts and the judges
132    that sit in those courts are not Article III judges and these judges cannot adjudicate matters of
133    ARTICLE III. These Judges of these courts are appointed for life terms, but obtain judicial powers
134    only when appointed to judicial courts with Article III power.

136          District courts and district court judges of the United States have been mistaken for Article
137    III courts and judges since the Judiciary Act of 1789. The mistaken belief that a court has
138    jurisdiction is sufficient to confer it when everyone is equally mistaken; but that jurisdiction
139    remains what it is and not what it is mistaken to be.

140    Names are labels, and like book covers, do a notoriously bad job of identifying contents, and
141    just as a book cannot be accurately judged by its cover, a federal trial court is not accurately
142    described by the name of the state where it is located. The names of the federal trial courts in the
143    several states are labels that are fully explained in the first sentence of the "Historical and Revision
144    Notes" that are part of the law: "Sections 81—131 of this chapter show the territorial composition
145    of districts and divisions by counties as of January 1, 1945." Since the conclusion of the Civil War,
146    the States of the Union are the federal territory within the state and the state officers who have taken
147    an oath to uphold the United States Constitution.

148

149    The subject matter of Chapter 5 of Title 28 U.S.C. is the territorial composition of districts
150    and divisions by counties as of January 1, 1945. Of the courts named in Sections 81—131, which
151    can only be the areas subject to the exclusive jurisdiction of the United States—federal territory,
152    these areas consist of places like the national parks, military bases, federal buildings and federal
153    courthouses. Crimes that occur on or in these federal places are federal crimes, and the federal
154    courts for the districts are the proper forum for trials of those crimes. Article III judicial power is
155    not needed for those courts, and those courts are certainly without such power. There is no room for
156    legalistic interpretations of Chapter 5.

157

158    The only legislation, since the first judiciary act on September 24, 1789, to create an Article
159    III United States district court is found in §91 of Title 28 U.S.C. This section documents the change
160    of a territorial court to an Article III court, without actually giving the court Article III judicial
161    power. Nothing can be done to change the nature of these courts in the several states without the
162    direct intervention of Congress by legislation.

163

164    A judge without judicial power can do nothing to change the jurisdiction of the court where
165    he presides. Any litigant or Petitioner in any federal court proceeding, who attempts to have the
166    United States district court consider the issues raised in action, should be aware that the American
167    Law Institute's Restatement of Judgments, holds that such a litigant is bound by the court's ruling.
168    A federal judge sitting in a trial court in any United States district court is without judicial power,
169    while such an official can be a life-tenured bureaucrat, such an official cannot be expected to rule
170    other than administratively.

171

No United States district court (legislative) in any state may lawfully exercise Article III court power. *The lawful jurisdiction of the federal district court (Article III) or courts is limited to those places where Congress has exclusive jurisdiction.* It is also clear that federal judges and federal courts have been used in the past by the federal government to create the appearance of an Article III tribunal, but the transferring of an Article III judge to a state territory, does not create an Article III court or jurisdiction. The federal courts within the several states, known as United States District Courts are federal and territorial, in that, these courts implement administrative law on territory exclusively under the jurisdiction of the United States of America *Corporate / legislative*, and not Congress *Constitutional*. ARTICLE III is the jurisdiction for ATS and Jus Cogens claims brought by American Aborigine, the American Indian, the Plaintiff.

Article III judicial power imposes self-restraint on judges. Only judges appointed to Article III courts may exercise the judicial power of the United States found in Article III, Section 2. Judicial power imposes restraints on the judges that have it and that serves as some protection from judicial abuse, which includes refusing to accept the properly filed "Pauperis" and the court's deliberately delaying justice; such actions by this court are unlawful and will be reported to the Appeals Court.

All justices appointed to the Supreme Court of the United States are genuine Article III judges, and the Aborigine rights of Plaintiff are established under Article III jurisdiction, therefore the demand for proper jurisdiction must be met in an Article III Court.

Plaintiff is not learned in the ways of law, so Plaintiff finds elation in and relief from knowing, through vigorous research, that the court has rushed to judgment and has violated Plaintiff's rights and now must correct. Judges of other than judicial courts, of course, have no constitutional judicial power and tend to be extremely rigid in the way they administer their "judicial business", and often make errors following legislative policy. These judges are, or can be, called territorial, legislative or administrative, and Plaintiff now understands that the administrative efforts and demands made by the Court and the Clerk are made in violation of Article III protections guarantees, and those administrative demands are herein challenged.

205        Lawyers and judges must be aware of the true nature of the courts they practice and preside

206        in. Everyone must be made aware that the United States district courts established in California and

207        in 48 other states by United States Statute are not Article III courts, therefore this issue should be

208        dismissed in the instant.

209

210        Lifetime tenure fuels the universal presumption in the legal academic community that the

211        federal districts courts are Article III courts, and that the judges that sit in those courts are Article III

212        judges. Because of Article 4-Congress can make law locally or nationally, and it must be presumed

213        that law, enacted by Congress is territorial in scope rather than national, *Foley Bros. Inc. v. Filardo*

214        *336 U.S. 281(1949)*, unless a contrary intent is shown in the legislation itself. The legislation

215        creating the district court for Hawaii is a clear example of the presumption and an example of a

216        national legislative intent to create an Article III court.

217        Congress has provided that territorial Title 28 U.S.C. judges be appointed to the United

218        States district court (legislative) for the district of Hawaii, and are to be appointed to an Article III

219        court. *The district judges for the district of Hawaii are specifically to be appointed by the President*

220        *pursuant to sections 133 and 134 of title 28, United States Code, as officers of the United States,*

221        *but not as judges of an Article III court*. These two sections are also to be used in appointing any of

222        seven judges of the Puerto Rico district should a vacancy occur there. It can be deduced that

223        appointment pursuant to § 133 and 134 of Title 28, will always produce territorial judges.

224

225        The Hawaii judicial district established in § 91 of the Judicial Code of 1948 was a territorial

226        court. The United States District Court of Hawaii is not a true United States court established under

227        Article III of the Constitution to administer the judicial power of the United States, Balzac *v. Porto*

228        *Rico, 258 U.S. 298, 312 (1922)*. In *Balzac*, Chief Justice William Howard Taft stated that United

229        States District Court for *Arecibo*, Porto Rico, as Puerto Rico was known then, "created by virtue of

230        the sovereign congressional faculty, granted under Article IV, § 3, of that instrument, of making all

231        needful rules and regulations respecting the territory belonging to the United States."

232

233        Puerto Rico is the Commonwealth of Puerto Rico and it has not been incorporated into the

234        United States though its inhabitants are United States citizens. The inclusion of Puerto Rico in

235        Chapter 5 as § 119 does not make the district court for Puerto Rico an Article III court, because

236        Puerto Rico has not been incorporated into the Union. Puerto Rico fits comfortably among the

237 names of the 50 states because the geographical areas are mini federal territories or federal
238 enclaves.
239

240     <u>Only Hawaii has an Article III district court, and that court cannot function as one, because</u>
241 <u>no ARTICLE III judges are appointed to that court; no other state has an Article III court</u>. The
242 federal district courts of RHODE ISLAND, MASSACHUSETTS, NEW JERSEY AND
243 PENNSYLVANIA fall squarely within the mold of the federal courts of the 49 states that have no
244 Article III district courts where matters of Jus Cogens under Alien Tort Statute claims must be
245 addressed.
246

247     The use of the term, "district courts of the United States" refers to Article III courts. There
248 are no more than two "district courts of the United States." There is no doubt that the district court
249 for Hawaii is an Article III court—that's one. The § 88 court for the District of Columbia is another.
250

251     The Historical and Revision Notes to that section make it clear that the District of Columbia
252 district court is a constitutional court established and ordained under Article III. The existence of at
253 least two "district courts of the United States" permits the general usage of language that refers to
254 the "district courts of the United States" as Article III courts.
255

256     Legal scholars assume without justification that the federal district courts are Article III
257 courts. Plaintiff has discovered, and proven, that no responsible public federal officer has ever
258 publically questioned these assumptions. In all the legal literature that Plaintiff examined, the status
259 of the United States district courts as Article III was assumed despite all the contrary authoritative
260 evidence.
261

262     The United States Supreme Court in two cases: Balzac v. Porto Rico, 258 U.S. 298 (1921)
263 and Mookini v. United States, 303 U.S. 201 (1938) made it clear that a ***"district court of the United***
264 ***States" described a court created under Article III*** and a ***"United States district court" described***
265 ***a territorial court***. The former identified a constitutional court of the United States exercising the
266 judicial power of the United States and the latter merely identified a court for a district of the
267 government of the United States.
268

269   The United States district courts are territorial and without judicial power. This has been so since
270       the Judiciary Act of 1789. As such, the United States District Court for the District of Rhode
271       Island, Massachusetts, New Jersey and Pennsylvania lack the jurisdiction to properly address
272   Plaintiff's claim and must provide an Article III Judge in an Article III venue with haste. The proper
273   venue for addressing Plaintiff's Law of Nations claims is in the District Court of the United States
274               of America, District of Columbia {Washington, D.C.].

## II. Nature of the Action

278   Plaintiffs, William Guy of the Pokanoket Nation, (the "Plaintiff") bring this claim to resolve
279       issues of environment racism, genocide and slavery against the tribal and individual rights of
280       Plaintiff on Plaintiff's historical lands located generally in what is called Town of Bristol,
281       Town of Warren and Town of Barrington, formerly known as SOWAMS, located in what is
282       now called the "State" of Rhode Island where Plaintiff and members of the Pokanoket Tribal
283       Trust Indian Nation have inhabited since and before colonial times, lands which were reserved
284       for the sustainable usage by the Aborigines occupying the territory; now illegally used,
285       inhabited and thereafter wrongfully taken from the ancestors of Plaintiff by the DEFENDANTs
286       in violation of Law of Nations, Customary international law and Alien Tort Statutes.
287   Under the Alien Tort Claims Statute, Jus Cogens and Law of Nations, Customary International
288   Law of Human Rights – Foreign Relations Law Section 702.

290   Plaintiff seek the repatriation of specific lands which are under environmental devastation, and
291       has been under environmental abuse and assault since the subject lands were forcefully taken as
292       a means to enrich the DEFENDANT State, while racially selecting, subjugating and killing the
293       aborigine inhabitants, deliberately destroying Plaintiff's culture, means of livelihood and very
294       existence, through means of physical and paper genocide, piracy, racial suppression and
295       discrimination, through systemic environmental racism targeting Plaintiff's ancestors and has
296       now placed *an extreme concentration of environmental burdens upon Plaintiff* and Plaintiff's
297       family, and the proof herein demonstrates Plaintiff's entitlement; DEFENDANTs' placing of
298       extreme environmental burdens on Plaintiff is in violation of *U.S. Environmental Protection*
299       *Agency's* definition of environmental justice, requires that "no group should bear a
300       disproportionate share of negative environmental consequences". Plaintiff makes claim of

301  DEFENDANTs' violations of the International Covenant on Economic, Social and Cultural
302  Rights (ICESCR) and the Universal Declaration of Human Rights (UDHR).

303
304  Plaintiff claims against DEFENDANTs for damage and destruction of safe and productive
305  habitat and environment; unlawful possession of lands; which DEFENDANTs have been
306  unjustly enriched by reason of the illegal taking of the subject lands; Plaintiff is denied the free
307  unencumbered right to use ancestral lands for ceremonies and cultural gatherings in violation
308  of Plaintiff's rights to own, develop, and use traditional lands and resources; Plaintiff has
309  suffered insurmountable human rights violations as a consequence of land rights violations and
310  environmental degradation which are inseparable from the DEFENDANTs' taking of the
311  subject lands, forcefully removing Plaintiff's ancestors under racists doctrines, in violation of
312  the ICERD (International Convention on the Elimination of All Forms of Racial
313  Discrimination), UNESCO (United Nations Educational, Scientific and Cultural Organization)'
314  Declaration on Race, also *See, e.g., Maya Indigenous Cmtys. of the Toledo District v. Belize*,
315  Case 12.053, Inter-Am. C.H.R., Report No. 40/04, ¶ 163 (2004),
316  Plaintiff is denied procedural environmental rights in violation of United States Presidential
317  Executive Order 12,898, which mandates that Procedural environmental rights include access
318  to environmental information, meaningful participation in environmental decision-making, and
319  access to legal redress for environmental wrongs, Plaintiff has been denied redress at every
320  governmental agency under DEFENDANTs control and authority. Plaintiff further alleges that
321  the denial of access to culture through denial of access to cultural lands has created an
322  *International Covenant on Civil and Political Rights (ICCPR)* Article 27 treaty violation and
323  the failing to ensure minority rights in this context, the DEFENDANTs et al has enacted
324  systematical racist actions and engages in environmental racism; Plaintiff further alleges that
325  discrimination is deemed systematic because the DEFENDANTs et al stripped his ancestors
326  and Plaintiff of land on which they and Plaintiff have lived since time immemorial.

327
328  Plaintiff also makes claim under Federal and State common law and in violation the Indian
329  Trade and Intercourse Act, 25 U.S.C.A. § 177 (the "Nonintercourse Act"), and that the
330  purported taking of the subject lands by the DEFENDANTs as described herein was void ab
331  initio. The CERD reinforced this holding in 2005, finding that New Zealand discriminated
332  against indigenous peoples by extinguishing the possibility of establishing customary titles and
333  failing to guarantee a right of redress for that wrong; Plaintiff asserts DEFENDANTs claim and

U.S. Congressional ruling to extinguish aboriginal title in Rhode Island is systematic discrimination and resulting from acts of environmental racism. The CERD also influenced the ruling in *Mabo v. Queensland II*, when the high court struck down the doctrine of *terra nullius*, upon which British claims to acquisition of Australia were based; the *Mabo* cases have informed a number of other national high courts around the world, leading them to recognize the validity of native title and adding to the level of acceptance of the prohibition of environmental racism; Plaintiff's property and procedural rights suffer inequitably from careless non-compliant actions of discriminatory interference committed by the state of Rhode Island and DEFENDANTs et al systemically.

DEFENDANTs are sued individually, as more fully defined below, and as representatives of a DEFENDANT class (the "Landholder Class") composed of all persons and entities (including each named DEFENDANT) that currently occupy or have or claim an interest in any of the subject lands and their successors and assigns, as more fully defined below.

### Standard of Jurisdictional and International Norms

**U.N. Human Rights and Environment Report**, *supra* note 2, ¶ 175 (citing R.G. Ramcharan, The Right to Life 310–11 (1983)) (stating that criminal and civil international law liability may arise from environmental harm that threatens the right to life); Collins, *supra* note 125, at 129 (suggesting environmental deprivations of rights have become customary international law because of recognition of this concept by international, regional, and domestic courts). Amici in *Flores* argued that environmental deprivations of rights violate customary international law, but their assertions are unlikely to be persuasive given *Flores*' sound rejection of their authority. Flores v. S. Peru Copper Corp., 414 F.3d 233, 265 (2d Cir. 2003) (citing The Paquete Habana, 175 U.S. 677, 700 (1900)). *Compare* Collins, *supra* note 125, at 129 (suggesting, without expressly stating, that environmental deprivations of rights are censured under customary international law) *with* Cohan, *supra* note 131, at 154 (stating that there is "little doubt" that indigenous peoples' environmental rights are protected under customary international law). *See* Sarah Krakoff, *Tribal Sovereignty and Environmental Justice, in* Justice and Natural Resources: Concepts, Strategies, and Applications 161, 167 (Kathryn M. Mutz et al. eds., 2002) (noting the similarities between African American and Native American

366    struggles for environmental justice); Kathryn M. Mutz, *Mineral Development: Protecting the*
367    *Land and Communities, in* Justice.

369    The **Stockholm Declaration**, discussed *supra* in Part III.A, speaks to the widespread
370    acceptance of the prohibition on environmental racism. It impliedly prohibits environmental
371    racism by recognizing the fundamental right to equality in an environment that permits a life of
372    dignity and well being. Stockholm Declaration, *supra* note 57, at 4 at princ. 1. The United
373    Nations acknowledges that "Principle 1 of the Stockholm Declaration established a foundation
374    for linking human rights and environmental protection." Joint United Nations Environmental
375    Programme-Office of the High Commissioner of Human Rights Expert Seminar on Human
376    Rights and the Environment, Geneva, Switz., Jan. 14–16, 2002, Human Rights and
377    Environment Issues in Multilateral Treaties Adopted between 1991 and 2001 (prepared by
378    Dinah Shelton), @ ohchr.org/english/issues/environment/environ/bp1.htm; accord U.N.
379    Human Rights and Environment Report, supra note 2, ¶¶ 32, 50.... The 1992 Rio Declaration,
380    issued 20 years after the Stockholm Declaration, reaffirms the international community's
381    commitment to these principles. *See* Rio Declaration, *supra* note 53,

383    The **African Charter and the San Salvador Protoco**l provide the same principle on a
384    regional level within Africa and the Americas, respectively, by recognizing the right to
385    environment alongside the obligation of non-discrimination. Together, these concepts prohibit
386    environmental deprivations of rights. African Charter, *supra* note 81, art. 2 (non-
387    discrimination), art. 21 (right to environment); Organization of American States, Additional
388    Protocol to the American Convention on Human Rights in the Area of Economic, Social and
389    Cultural Rights art. 3 (obligation of non-discrimination), art. 11 (right to environment), Nov.
390    17, 1988, O.A.S.T.S. No. 69 (entered into force Nov. 16, 1999) [hereinafter San Salvador
391    Protocol]. The Restatement recognizes the existence of regional customary international law.
392    Restatement (Third) of Foreign Relations Law of the United States § 102 cmt. e (1987).

394    The **Apartheid Convention**'s definition of "the crime of apartheid" includes any measure
395    designed to divide the population along racial lines, including the expropriation of property and
396    labor exploitation of a racial group. Both the Apartheid and Genocide Conventions prohibit the
397    deliberate imposition on a racial group of living conditions calculated to cause its physical
398    destruction. Such conditions would surely entail violations of social and economic rights, for

example, the rights to life, health, housing, or food. By prohibiting the larger wrong, therefore, the international community also sought to prohibit the lesser wrongs included therein. The Conventions thus seek to prevent environmental deprivations of rights, especially the rights to life, health, and property. Apartheid Convention, *supra* note 77, art. II(d) (expropriation of property), art. II (e) (labor exploitation). The Apartheid Convention limits its definition of group solely to racial groups, while the Genocide Convention contains a slightly broader definition. Apartheid Convention, *supra* note 77, art. II(b); Genocide Convention, *supra* note 80, art. II(c) (defining "group" as shared national, ethnic, racial or religious origin). For a discussion of the intent requirements of the Apartheid and Genocide Conventions, see *supra* note 94. Apartheid and Genocide Conventions, establishes that discriminatory expropriation of, or interference with, property is a form of environmental racism.

**International Convention on the Elimination of All Forms of Racial Discrimination** (ICERD) and the International Convention on the Suppression and Punishment of the Crime of Apartheid (Apartheid Convention). Stephens et al., *supra* note 9, at 203. These agreements are relevant to proving that racial non-discrimination is a norm of customary international law; however, as the Restatement cautions, it is only systematic racial discrimination, practiced by the state as a matter of state policy, that violates customary international law. Restatement (Third) of Foreign Relations Law of the United States § 702 cmt. i (1987); *see supra* notes 69–70 and accompanying text. International Convention on the Elimination of All Forms of Racial Discrimination, *opened for signature* Dec. 21, 1965, S. Exec. Doc. C, 95-2 (1978), 660 U.N.T.S. 195 (entered into force Jan. 4, 1969) [hereinafter ICERD]; *see* Kevin Boyle & Anneliese Baldaccini, *A Critical Evaluation of International Human Rights Approaches to Racism, in* Discrimination and Human Rights. Racism 135, 149 (Sandra Fredman ed., 2001) (noting that ICERD was the most widely ratified international human rights treaty until 1993, when the Convention on the Rights of the Child surpassed it). Notably, the ICERD imposes duties on States Parties that are "more than merely promotional," Schwelb, *supra* note 1, at 1016, which adds to its authority. *See* Jeffrey M. Blum & Ralph G. Steinhardt, *Federal Jurisdiction Over International Human Rights Claims*, 22 Harv. Int'l. L.J. 53, 89 (1981) (noting that the most authoritative international norms are those that create immediate legal obligations, as compared to non-obligatory norms that merely encourage appropriate action).

**Restatement (Third) of Foreign Relations Law of the United States** §§ 102(3), 102 cmt. i, Introductory Note to Part VII (1987); *see* Stephens et al., *supra* note 9, at 67 (noting that widely ratified international agreements, even those that are non-binding, may reflect a norm of customary international law); Blum & Steinhardt, *supra* note 76, at 89 ("Obligatory norms typically are expressed in numerous international instruments, including those that are most authoritative in that they reflect a broad consensus of states."). This may be true even when agreements do not purport to codify customary international law. Restatement (Third) of Foreign Relations Law of the United States § 102 reporter's note 5 (1987).

The **SOSA NORM for Environmental Racism in International Law**; environmental deprivations of rights are censured in both the Inter-American and African regional human rights systems and decried and defined most strongly by the CESCR. Protection against environmental racism targeted at indigenous peoples and their property rights is strong across the world, as evidenced by Inter-American, HRC, and CERD jurisprudence as well as Australia's *Mabo* decision and its numerous successors in other countries. Similar protections have been extended to prevent discrimination in procedural environmental rights, with the Inter-American system, the HRC, and Botswana as examples. As a whole, judicial decisions evince an especially strong protection of the right to property and procedural rights. The number of decisions suggests that the norm prohibiting environmental racism is widely accepted, as *Sosa* requires. By condemning concrete instances of environmental racism, these decisions suggest that the norm has definite content, thereby meeting *Sosa*'s first prong.

## III. DESCRIPTION OF SUBJECT LANDS

The lands claimed in this litigation (the "subject lands" or "Indian Lands") are located at Bristol County, Longitude 41.7000 N, Latitude 71.2800 W, more or less, in the Northeast section of the State of Rhode Island, including watersheds, mineral deposits, timber, fishing rights, and all other assets which run in or upon the land in said area which defines part of the Tribe's aboriginal territory as above described called Sowams, said title to which never having been deeded out by said Plaintiff or members of Plaintiff's tribe, nor have Plaintiff's rights been lawfully extinguished specifically by any federal law or otherwise.

463      Through the actions of the colonists placing many members of the Tribe into exile in many
464      areas as far away as the West Indies, subjecting members of Plaintiff's family to murder,
465      banishment, slavery servitude and other illegal actions by the colonists, and that much of such
466      land was taken over by the colonists through wrongful encroachment. This said area came
467      within the jurisdiction of the colony of Rhode Island pursuant to the Charter of King Charles II
468      dated July 15, 1663 and the laws remained in that posture until the enactment of the Rhode
469      Island Constitution in 1842 wherein the said Charter became part of the Constitution, which
470      simply absorbed the lands as part of the state of Rhode Island.
471
472      When DEFENDANTs became established as conquerors of the lands of Plaintiff and his
473      family, the lands were vibrantly and abundantly productive, providing a sustained quality for
474      human existence, but today these lands are considered by the United States based, Toxic
475      Action Center, as one of the most toxic and polluted places in America. Since the taking of
476      Plaintiff's ancestral lands the State of Rhode Island has nearly destroyed the once sustainable
477      environment.
478
479      Today, Rhode Island currently has 200 sites that are suspected hazardous waste disposal sites
480      and12 hazardous waste sites included on the United States National Priorities List, which are
481      the sites ranked nationally as posing the worst threats to human health and the environment.
482      Rhode Island also has some of the worst air quality in the nation, as well as rivers and lakes
483      polluted by industrial contaminants and toxic mercury. Asthma and cancer rates are some of
484      the highest in the country, and both can be linked to environmental causes
485
486      Additionally, members of Plaintiff's family and membership are subjected to acceptance of
487      state subsidized housing and apartment dwellings and lands attached, which are dangerously
488      filled with toxic molds and other contaminants from years of industrial and commercial toxic
489      textile mill run-offs, causing deprivation through overt systematic environmental racism,
490      neglect and abuse.
491
492                              **IV PARTIES**
493
494      Plaintiff, William Guy (the "Plaintiff"), is a Non-resident Inhabitant, Foreign National to the
495      state of Rhode Island and Massachusetts, acting as trust authority and Chief (Sagamore) of the

496      Pokanoket Tribal Trust, individually a descendant and heir of the original aborigine described
497      in a deed from Wamsutta a/k/a Alexander to Thomas Willett, dated April 8, 1661 (the
498      "Deed"), and as an American National whose lands, culture, religious beliefs, heritage have
499      been taken and dispossessed of illegally under the Constitutions of the United States and the
500      State of Rhode Island, which had followed the Charter of Rhode Island of 1663 from King
501      Charles II giving the aborigines certain ownership guarantees to the use and possession of their
502      lands.

503
504      Plaintiff, the Pokanoket Tribal Trust, is an aborigine tribe, band, clan, family or entity
505      recognized by the State of Rhode Island, with activities in Rhode Island and Massachusetts.
506      As used in this complaint, "Plaintiff Tribe" shall also include the Pokanoket Tribal Trust, and
507      one, some or all of the Pokanoket Tribal Trust aborigine tribes located within the subject lands
508      in 1661, and which had members that had inhabited and settled upon the subject lands.

509
510      Plaintiff Tribe is identical to or is a political successor in interest to the aboriginal Indians at
511      Sowams, which were members of the Pokanoket Nation but forced under penalty of death to
512      use the name Wampanoag, and which occupied the subject lands from time immemorial. At
513      all relevant times and up to the present, Plaintiff Tribe or its predecessors in interest have
514      continuously maintained tribal relations. Plaintiff Tribe is a pre-colonial era aborigine group
515      whose entitlement has never been terminated or abandoned.

516
517      Plaintiff is the direct descendent and heir of King Phillip of the Pokanoket Nation and sixth
518      great grandson of Simeon Simon, direct descendant of original aborigine inhabiting lands
519      described above as SOWAMS.

520
521      DEFENDANT Town of Bristol (the "Town") is a municipal corporation organized and
522      existing under the laws of the State of Rhode Island. The Town currently claims title to and
523      occupies portions of the subject lands. DEFENDANT Town of Barrington (the "Town") is a
524      municipal corporation organized and existing under the laws of the State of Rhode Island. The
525      Town currently claims title to and occupies portions of the subject lands.

526
527      DEFENDANT Town of Warren (the "Town") is a municipal corporation organized and
528      existing under the laws of the State of Rhode Island. The Town currently claims title to and
529      occupies portions of the subject lands.

530   DEFENDANT State of Rhode Island (the "State") has no deed, title or bill of sale showing
531   valid acquisition of the subject lands from the Pokanoket. The State currently claims title to
532   and keeps Plaintiffs out of possession of portions of the subject lands. The State also acted as
533   the trustee of the subject lands, and purported to authorize the Towns to acquire portions of the
534   subject lands.
535
536   The DEFENDANTS, the State of Rhode Island, the Town of Warren, the Town of Bristol
537   and the Town of Barrington are sued both individually and, pursuant to Rules 23(a) and (b)(1)
538   of the Federal Rules of Civil Procedure, as representatives of the DEFENDANT class (the
539   "Landholder Class"), composed of all persons or entities that occupy or have or claim an
540   interest in any of the subject lands and their successors and assigns as of the filing of this
541   complaint.
542
543   The number of members of the DEFENDANT class is approximately 10,000 or more
544   persons and is thus so numerous that joinder of all members is impracticable. There are
545   questions of law and fact common to the members of the DEFENDANT class, and the
546   defenses of the named representatives are typical of the defenses of the class. The
547   representative DEFENDANTs will fairly and adequately represent the interests of the
548   DEFENDANT class.
549
550   The prosecution of separate actions against individual members of the DEFENDANT class
551   would create a risk of adjudications with respect to individual members of the class which
552   would as a practical matter, be dispositive of the interests of the other proposed class members
553   or substantially impair or impede their ability to protect their interests.
554
555                              **V  POINTS AND AUTHORITY**

556   From time immemorial down to the time of the colonial invasion of the first settlers in
557   New England, Plaintiff's family and members of the Pokanoket Tribal Trust were a prosperous
558   and powerful society. Numerous Pokanoket villages thrived throughout Sowams, Rhode
559   Island and southeastern Massachusetts taking advantage of the fertile soils and abundant
560   resources of the sea. Plaintiff's tenth great grandfather 'Massasoit was the chief of the
561   Pokanoket Nation, with a territory extending from the eastern tip of Cape Cod through
562   southeastern Massachusetts and Rhode Island to the Connecticut River, and north to the

563 Charles River. Massasoit (also known as Ousamequin) lived in what is now Bristol, Rhode
564 Island, then called Sowams and later named the Town of Barrington and Town of Warren,
565 Rhode Island. During this period of time, the Tribe and its members were living, possessing
566 and using the lands which are the subject of this complaint.
567
568 Plaintiff's great grandfather, Massasoit led his nation and greeted the European Pilgrims
569 arriving in Plymouth, Massachusetts. He met with the leaders of the Pilgrims and provided
570 them with food and shelter and other information necessary for their survival. He entered into
571 a fifty year treaty with the Pilgrims in 1621, assuring the peaceful coexistence of the colonists
572 and the Pokanoket Indians.
573
574 According to the writings of Rhode Island official, Roger Williams, Massasoit
575 welcomed the colonists with open arms. He allowed them the use of all the land they needed.
576 Unfortunately, with the coming of the colonists came much hardship for the Plaintiff's
577 ancestors. Soon after the arrival of the colonists, thousands of Pokanoket were swept away
578 through a terrible and fatal pestilence of plague and disease which had been brought by the
579 colonists, and for which the Indians had no immunity.
580
581 Plaintiff's tribal family has inhabited the subject lands for many years. As the colonists
582 took more and more territory the Natives were forced into smaller areas. The colonist
583 expansion continued to intrude on the lands of the Pokanoket, and tensions mounted. King
584 Philip, Massasoit felt trapped by the colonists and began to defend his lands.
585
586 In 1675 and 1676, the King Phillip War against the colonist occurred. Many battles
587 were fought on the subject lands, as the Natives tried desperately to hold on to one of their last
588 refuges. At the end of the war, Sir Edward Randolph, an emissary from the King of England
589 was dispatched to the colonies to determine the cause of this conflict. After his investigation,
590 Edward Randolph issued a report to the King entitled the "Eighth Inquiry", wherein he
591 determined that the cause of the conflict was mostly the fault of the Colonists and not the
592 Indians. He stated that at the end of the war, the government of Boston concluded a peace with
593 the Indians stating that "all Indians have liberty to sit down at their former habitations without
594 let." It is to be noted that subsequent to this war, the Colonists illegally abducted many Indians
595 including family members of the Pokanoket from their various lands

596  Many Pokanoket members were sold into slavery, deported to various countries,
597  especially the West Indies, and many others were massacred. This was a wrongful genocidal
598  act against the Pokanoket and the beginning of acts of apartheid and the illegal taking of the
599  lands of Sowams, which the State of Rhode Island holds no valid deed.

601  The Pokanoket Indians were forcibly driven from their lands illegally by the colonists,
602  who simply moved in after the murder and beheading of the Massasoit by the colonist. The
603  area of the subject lands known as "Sowams" which were taken after remaining members of
604  King Philip's family gathered and taken to what is now known as Connecticut; Plaintiff's
605  people were placed on the Shetucket Reservation.

607  On October 19, 1694 the Massachusetts Bay Colony approved the formation of the
608  North Purchase lands as the town of Attleborough, which included the Indian Lands, which at
609  the time became known as the Attleborough Gore.  A controversy ensued between Rhode
610  Island and Massachusetts over control of the Attleborough Gore.  Rhode Island claimed control
611  of this land based upon its Charter from King Charles II dated July 15, 1663.  This controversy
612  continued until in 1746 when King George II in council detached the Attleborough Gore from
613  Attleborough and annexed it to the county of Providence, and named the area Cumberland
614  within the colony of Rhode Island.

616  Plaintiff alleges that as a dark aborigine he and his family were ordered not to use their
617  cultural name of Pokanoket under the penalty of death, leading to the false identifier called
618  "Wampanoag", and later through paper genocide, fraudulently misclassified as "colored" in
619  birth records, creating the appearance that Plaintiff's family were indentured negroes, for the
620  purpose of taking Plaintiff's land and rights of aborigine heritage, leading to the intentional
621  taking and destruction of natural lands and resources, which have been enjoyed by Plaintiff and
622  Plaintiff's tribe since before European incursion.
623  Current racial discrimination  actions and tactics also forbids Plaintiff from performing sacred
624  ceremonies at the historical location where Plaintiff's great grandparents held council and lived
625  for more than 800 years; the same lands which are now contaminated with sludge, toxins, oil
626  run-off and whose water way is pollution filled and unusable for wildlife nor human
627  sustainability.

629 The Charter of Rhode Island and Providence Plantations granted on July 15, 1663 (the
630 "Charter"), annulled all prior claims to Indian lands by right of discovery or conquest. The
631 Charter provided that all Indian land titles were held by the Indians; and upon any conveyance
632 from the Indians, title must be confirmed and established by royal consent throughout Rhode
633 Island. The Charter clearly recognized the absolute title to the Indians of all Indian lands, and
634 the responsibility of the government to direct the process when purchases were made from the
635 Native Indians. The subject lands were never conveyed by the Indians to any colonist in
636 conformity with the Charter, the Constitution of Rhode Island or the United States. There has
637 never been any agreement to sell or transfer the aborigine ancestral lands that are being
638 occupied.
639
640 The DEFENDANT State, Town and the City occupied, and continue to occupy, the Indian
641 Lands. Upon information and belief, they have severed timber, minerals, and other valuable
642 resources from the subject lands, and they continue to do so. Upon information and belief, they
643 have inflicted damage, pollution, and destruction upon the subject lands, and they continue to
644 do so.
645
646 Plaintiff's ancestors have sought redress of the wrongs described here from the both executive
647 and legislative branches of the government of the DEFENDANT State, Town and City for
648 many years. The State, Town and City have refused to take any action to redress these wrongs.
649
650 Plaintiff makes declaration that Plaintiff nor any members of Plaintiff's Tribe have ever chosen
651 to sell the aborigine Lands to the DEFENDANT State, Town or the City, nor has it given up
652 any of its rights over such lands.
653
654 Plaintiff has delivered proper Notice to Department of Commerce (DOC) for proper race and
655 identity correction and on February 6, 2015 Plaintiff received un-rebutted communication from
656 the United States (DOC) Office of Inspector General for redress of race classification
657 correction, attached hereto as **EXHIBIT A**.
658
659 Plaintiff has brought this action against the named DEFENDANTs only because all other
660 avenues of redress have been closed until this filing; Plaintiff again cites that the state of Rhode
661 Island has perpetuated a system that discriminates, on grounds of race, against plaintiff by
662 denying access to cultural habitat, cultural rights, environmental information, environmental

663     decision making, and legal redress for environmental wrongs, cultural deprivations,
664     involuntary servitude and genocide.
665

## VI REMEDY
666
667
668 Plaintiff belief that judicial remedy could and should provide that the right to environment includes
669 access to resources and confers a private cause of action to, inter alia, stop an environmentally
670 harmful action, compel an environmental audit, restore environmental harm, and pay compensation
671 for environmental damage, allowing minors, as representatives of future generations, to sue for
672 violations, right to environment into definite terms, citing that right when denying environmental
673 permits and issuing orders to close industrial plants whose pollution breaches the right, recognizes
674 that apartheid reached the right to property and provides remedies to victims whose right to
675 property was violated as a result of past racially discriminatory laws or practices, providing that
676 property rights may not be interfered with, except by a law of general application
677
678 DEFENDANTs must affirmatively seeks to undo its "deep-rooted legacy" and "institutionalism of
679 environmental racism, effected by preventing discriminatory concentration of environmental
680 burdens and ensuring equitable distribution of environmental benefits, provisions thus provide
681 concrete content against which protection from environmental racism can be measured.
682
683 DEFENDANT must affirmatively seek diverse initiatives extending strong protections against
684 environmental racism to Plaintiff's subject lands, recognizing the vulnerability of Plaintiff's
685 specific racial groups to environmental racism.
686

## VII CLAIMS AGAINST DEFENDANTS
### COUNT I
687
688
689
690 Plaintiff herein repeats, restates and incorporates by reference the allegations as mentioned above.
691
692 Under International law, ATCS, Jus Cogens and Federal common law, Plaintiff holds by right
693 aboriginal title to and the exclusive right to occupy under trust the aforementioned lands as stated
694 and described herein. This right cannot be terminated, and can only be apportioned by a plain and
695 unambiguous act of the United States Congress. There has been no such act by the United States.

696 The DEFENDANT State purported to authorize the taking of the Indian Lands by the Town and the
697 City.

698

699 By purporting to authorize the taking of the Indian Lands by the Town and City, the State intended
700 to, and did, authorize and cause the Town and the City to permanently possess the Indian Lands.
701 The State and the Town and City violated, and continue to violate, the Plaintiff' international and
702 Federal common law rights of aborigine title to and possession of the aborigine lands.

703
704 The DEFENDANT State directly lent the sovereign power of the State to establish "title" to the
705 subject lands by means of threat, murder, genocide and race misclassification, then authorizing the
706 DEFENDANT Towns to take the Plaintiff's lands.

707

708 By authorizing, ratifying and causing the authorization to the Towns to take the lands, the State
709 jointly participated in and is liable for each and every act of the Towns as well as for its own illegal
710 actions with regard to the taking and environmental destruction of the Plaintiff's lands.
711 Accordingly, Plaintiff and family members are entitled under international law the relief described
712 below.

713
714 Plaintiff is entitled to damages from the State, from the time each portion of Plaintiff's lands were
715 unjustly acquired or transferred from the Plaintiff and Plaintiff Tribe by the DEFENDANT State
716 and the Towns to the present time, with interest, in the amount of (a) the fair market rental value of
717 each relevant portion of the aboriginal lands, as improved; (b) the amount by which the value of the
718 taken lands was diminished by any damage, environmental pollution or destruction; (c) the value of
719 all minerals and other resources taken from the subject lands, equal to the price of such resources in
720 their final marketable state; and (d) any diminution in value of the lands as a result of the taking of
721 such resources.

722
723 In addition, because remedies at law are inadequate to permit full recovery by Plaintiff for the
724 harms inflicted by the DEFENDANTs, and because information concerning the damages, which
725 resulted to the Plaintiff from the illegal land transactions described above is uniquely within the
726 possession of the DEFENDANTs, Plaintiff and tribal family members are entitled to an accounting
727 by the DEFENDANTs, with interest, for the entire period from the time each portion of the lands
728 were wrongfully acquired or transferred by the DEFENDANTs until the present time.

729 Finally, because the State received benefits from its purported purchases and sales of the ancestral
730 tribal lands, including the selling of such land at a profit, the retention of which would be unjust
731 under the circumstances, Plaintiff is entitled to disgorgement of the value of those benefits, with
732 interest.
733

734 <center>**COUNT II**</center>

735 <center>(Constitutional Violation of 42 U.S.C. §1983 Claim Against the State)</center>

736 Plaintiff herein repeats, restates and incorporates by reference the allegations as mentioned above.

737
738 The States actions constitute a permanent and substantial interference with the use and enjoyment
739 of the ancestral lands by the Plaintiff and Plaintiff Tribe, amounting to a taking of an interest in the
740 aboriginal lands without compensation. The Fifth Amendment of the United States Constitution
741 prohibits the taking of property without just compensation. The taking of the aborigine lands by the
742 DEFENDANT State without compensation violates the Fifth Amendment of the United States
743 Constitution.

744

745 The taking of the Indian Lands by the DEFENDANT State without compensation deprives Plaintiff
746 of the rights, privileges and immunities secured to it by the statute of the United States of America,
747 specifically, United States Code, Title 42, Section 1983 et seq. Plaintiff has been without an
748 adequate remedy at law to compensate it for the continued invasion of its rights by the
749 DEFENDANT State.

750

751 <center>**COUNT III**</center>

752 <center>(Violation of Article 1, Section 16 of the Rhode Island Constitution)</center>
753 Plaintiff herein repeats, restates and incorporates by reference the allegations as mentioned above.

754

755 The acts of the DEFENDANT State constitute a permanent and substantial interference with the use
756 and enjoyment of the aborigine lands by the Plaintiff and Plaintiff tribal family, amounting to a
757 taking of an interest in the abovementioned lands without compensation.

758
759 Article 1 of the Rhode Island Constitution prohibits the taking of property without just
760 compensation. Plaintiff has been without an adequate remedy at law to compensate it for the
761 continued invasion of its rights by the DEFENDANT State.

<center>23</center>

## COUNT IV

### Violation of ICERD Convention

Plaintiff herein repeats, restates and incorporates by reference the allegations as mentioned above.

The acts of the State constitute a permanent and substantial interference with the right of the Plaintiff and the Plaintiff Tribe to a fair procedure, right of use to ancestral lands and territories, the right to life, food, water, health and the right to environmental protections against racial discrimination and the right to self-determined actions to establish self sustainability without infringement by DEFENDANTs et al.

Plaintiff and Plaintiff Tribe are without an adequate remedy at law to compensate it for the continued invasion of its rights by the State.

## COUNT V

### Violation of the Apartheid Convention

Plaintiff herein repeats, restates and incorporates by reference the allegations as mentioned above.

In 1789, Article 1, Section 8 of the United States Constitution gave the federal government the exclusive power to regulate commerce with the Indian tribes. The DEFENDANT State lacks jurisdiction over aborigine lands of Plaintiff. The First Congress under the Constitution enacted the Indian Trade and Intercourse Act. Section 4 of the act (the "Nonintercourse Act") expressly forbade and declared invalid any sale of Indian land without the consent and approval of the United States.

The Nonintercourse Act was a statutory restraint on alienation of Indian land and a clear manifestation of the United States federal government's intent on retaining Indian lands, including the Indian Reservation Lands, under the federal government's exclusive control. The DEFENDANT State has systematically committed acts of apartheid against plaintiff through efforts of racial separation, taking plaintiff's lands to enrich others of a different racial class, causing unending social, economic and cultural depletion of Plaintiff's rights.

The DEFENDANT State's crimes of apartheid has caused an environmental deprivations of rights, including the rights to life, health, and property; expropriating Plaintiff's property, deliberately, willfully and in bad faith violated its own federal Constitution of the United States and the

796  Nonintercourse Act in allowing for the transferring of the interest of Plaintiff' natural and ancestral
797  lands.

798

799  Plaintiff has not been able to defend or prevent under the United States laws, the Nonintercourse
800  Act or the Environmental Protection Agency laws against DEFENDANTs' environmental
801  deprivations of rights perpetuated against Plaintiff, especially the rights to life, health, and property,
802  DEFENDANTs created an environment that has forced Plaintiff to work within a system outside of
803  Plaintiff's culture and primarily for the enrichment of DEFENDANTs et al, who stole Plaintiff's
804  lands, thereby removing and destroying Plaintiff's right to life within Plaintiff' culture; Plaintiff is
805  subjected to violations of the Apartheid Convention, *supra* note 77, art. II(d) (expropriation of
806  property), art. II (e) (labor exploitation).

807

808  DEFENDANTs have committed acts in violation of the Apartheid and Genocide Conventions,
809  which establishes that discriminatory expropriation of, or interference with, property is a form of
810  environmental racism.

811
812  Plaintiff has been without an adequate remedy at law to compensate it for the continued invasion of
813  its rights by the DEFENDANT State

814

815                               **COUNT VI**
816                             Environmental Racism
817  Plaintiff herein repeats, restates and incorporates by reference the allegations as mentioned above

818
819  The State has refused, and still refuses, to reconcile with Plaintiff, the criminal acts of taking and
820  causing environmental deprivation through racist doctrines and open and covert oppressive
821  methods, subjecting Plaintiff and Plaintiff's natural ancestral habitat to destruction and irreparable
822  harm.

823
824  The DEFENDANT State took pristine lands from the Plaintiff and has left lands of SOWAMS
825  permanently wasted and under environmental attack from waste and pollution from the many textile
826  mill run-offs and has left all the region of SOWAMS in ill repair, and with no concern for the
827  sustainable existence of Plaintiff or the many the aborigine inhabitants remaining in territory of

828 SOWAMS; the DEFENDANT State has committed systemic racial deprivation, leaving sickness
829 and death of wildlife, human inhabitants and environment.

830
831 Plaintiff and Plaintiff Tribe are without an adequate remedy at law to compensate it for the
832 continued invasion of its rights by the State.

833

834 ## DEMAND FOR RELIEF

835
836 WHEREFORE, Plaintiff respectfully pray for an order:

837 1. Right to unencumbered use of ceremonial lands and the return of other vacant lands
838 subject to environmental decay and destruction.

839 2. Return of available lands to be reserved for future generations.

840 3. Compensation from taxes collected by the State of Rhode Island for the last 150
841 years.

842 4. An apportionment of 51% of all tax revenue going forward from the final order of the
843 court.

844 5. Return of Plaintiff's principle village, currently called Mount Hope Farm held by the
845 Town of Bristol and Haffenreffer Museum held by Brown University.

846 6. Ecological reparations for the environmental destruction to air, land and water ways
847 of Plaintiff's ancestral habitat.

848 7. Re-enfranchisement of rights and implicit governance of the repair and maintenance
849 of environmentally affected lands mentioned herein as SOWAMS (Town of Bristol)
850 (Town of Warren) and (Town of Barrington).

851 8. Obligate DEFENDANTs et al to consider the environmental interests of Plaintiff and
852 hold DEFENDANTs accountable for historic inequities in such decisions of
853 deprivation against Plaintiff's rights as mentioned above, providing environmental
854 justice in the right to participate as equal partners at every level of decision-making
855 including needs assessment, planning, implementation, enforcement and evaluation of
856 toxic ancestral lands inhabited by Plaintiff and Plaintiff's family members.

857 9. Declaring that the Indian Lands were acquired or transferred from the Plaintiff and
858 Plaintiff Tribe in violation of Federal and State law, and that any so-called taking or
859 transferring of Indian Lands was void *ab initio*;

10. Declaring that Plaintiff and Plaintiff Tribe are the owners of, and have the legal and equitable title, as well as the right to use and possess, the aborigine lands claimed or held by any DEFENDANT or member of the Landholder Class;

11. Awarding such declaratory and injunctive relief as necessary to effectuate Plaintiff and Plaintiff's family's right to possession, to which the proof demonstrates their entitlement;

12. Awarding Plaintiff and Plaintiff Tribe damages, and interest thereon, as described above in the complaint;

13. Requiring an accounting by the Landholder Class, the State, Town and the City, with interest, as described above in this complaint;

14. Requiring the DEFENDANTs et al to disgorge the benefits they have received from their illegal purchases, sales and possessions of the subject lands, with interest;

15. Awarding such other and further relief, both special and general, at law or in equity, as the Court may deem just and proper.

Plaintiff

*William Winds of Thunder Guy*

William Winds of Thunder Guy,
Sagamore of the Pokanoket Nation
Pokanoket Tribal Trust

_____

STATE OF RHODE ISLAND}
COUNTY OF BRISTOL}

VERIFICATION

I, William Winds of Thunder Guy, verify that I have developed and submitted the allegations contained in the Verified Complaint, that I have personal knowledge of the facts, and that the facts stated in the Verified Complaint are true, except those facts alleged upon information and belief, as to those facts, I believe they are true. Further, the use of a NOTARY is not accepted by Plaintiff as an adhesion to any United States legislative contracts applied to the use of a NOTARY.

*William Winds of Thunder Guy*

William Winds of Thunder Guy

894  The foregoing instrument was acknowledge before me this _18th_ day of June, 2016, by

895  William Winds of Thunder Guy, who personally appeared before me and acknowledged the above

896  to be his free act and deed.

897

898  _____

899  Notary Public

900  My Commission Expires: 7-19-2020